IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

MAR 1 5 2005

Michael N. Milby, Clerk

| | | |
|---|---|---|
| JANIE RIVAS, et al. | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-96-493 |
| | § | |
| MONSANTO COMPANY, et al. | § | |

## REPORT AND RECOMMENDATION

Before the Court by referral from the District Court are numerous motions filed by Defendant Pharmacia Corporation f/k/a Monsanto Company ("Monsanto") and by Defendants Amoco Chemical Company, Atlantic Richfield Company, Chevron Chemical Company, and Hoechst Celanese Corporation ("the Amoco Defendants"). Having carefully considered the briefs and supporting information filed by the parties, the Court submits its Report and Recommendation to the District Court.

## Background

From 1957 to 1983, a chemical reprocessing facility operated on an area of land now referred to as the Brio and DOP Sites ("Brio/DOP sites"), named from the original companies of Dixie Oil Processors and Brio Refining Company. The land consists of two parcels, one on either side of Dixie Farm Road in southeast Harris County, Texas. The Brio site came into existence in 1957, and the DOP site was created in 1962. These sites contained a number of pits in which chemicals were disposed of over the years. Monsanto and other companies sold materials to the owners of the

1

Brio/DOP sites for reprocessing beginning in the late 1950's.

In the 1970's, various developers and home builders built a residential area known as the Southbend Subdivision adjacent to the Brio/DOP sites. The development included construction of an elementary school that inevitably attracted couples with small children to Southbend. The Plaintiffs in this case were among the children who moved to Southbend or were born to parents residing there. By all accounts, all of the Plaintiffs were minors during the alleged exposure periods.

In the early 1980's, various regulatory agencies determined that serious environmental issues existed at the Brio/DOP sites. The Texas Water Department, for example, requested enforcement action against Brio Refining Company in 1983 after the state agency found that waste materials had already migrated from the Brio/DOP sites and were resurfacing on the residential properties being developed. The Environmental Protection Agency ("EPA") eventually designated the Brio/DOP sites as a Superfund Site, and the Brio/DOP sites were nominated for placement on the National Priorities List in 1984.

Plaintiffs allege that the Defendants in this case were eventually identified as Potentially Responsible Parties and were given the option to arrive at a plan for remediation or to allow the EPA to conduct testing for them.   According to Plaintiffs, the Defendants banded together to form the Brio Site Task Force, in which Monsanto took the lead.  Plaintiffs allege that dangerous chemicals migrated from the Brio/DOP sites and that they were exposed to them both through the ground and by air.  According to Plaintiffs, the Defendants provided false information to the public and regulatory agencies concerning the public's exposure to dangerous chemicals and the possible harms that could result.  Plaintiffs further allege that they have suffered many physical and emotional ailments as a result of relying on Defendants' representations.  In 1996, two suits were filed in the

2

District Court concerning the Brio/DOP sites. On August 19, 1999, G-96-494 was consolidated with the instant case.

### **Discussion**

<u>Defendants' Rule 9(b) Motion to Dismiss</u>

Defendants ask that Plaintiffs' claim of fraud be dismissed pursuant to Fed.R.Civ.P. 9(b). That rule requires that a pleading must state the circumstances constituting fraud with particularity, although malice, intent, knowledge, and other conditions of mind may be averred generally. At a minimum, Rule 9(b) requires specific assertions of the time, place and contents of the false representation, the identity of the person making it, and what that person obtained thereby. *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1994). In other words, it must allege "the who, what, when, where, and how" of the fraud. *United States v. Dow Chemical Co.*, 343 F.3d 325, 328 (5th Cir. 2003). A plaintiff cannot simply allege that the defendant had a fraudulent intent; he must set forth specific facts to support an inference of fraud. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). Facts are sufficient if they either (1) show a defendant's motive to commit fraud or (2) identify circumstances that indicate conscious behavior on the defendant's part. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996). Dismissal for failing to comply with Rule 9(b) is treated as a Rule 12(b)(6) failure to state a claim. *Dow Chemical Co.*, 343 F.3d at 328.

Plaintiffs claim that the Defendants failed to disclose the nature and extent of the chemicals disposed of at the Brio/DOP sites, misrepresented the impact such chemicals would have on Plaintiffs, and lied about the nature of the site to the public. Second Amended Complaint at ¶ 63. Such allegations sufficiently state the "what" of Plaintiffs' fraud allegations. However, Plaintiffs

3

make no effort to identify any specific instance of fraud and do not point to any statement that can be tied to an exact point in time. Instead, they allege generally that the Defendants' fraud and misrepresentation began in 1983 and extended to the late 1990's. Id. at ¶ 62. In addition, they fail to identify who made any of the fraudulent statements at issue here, relying instead on a generalized claim that "Defendants' own documents" show the existence of fraud. Id. at ¶ 61.

These allegations fail to meet the standards of Rule 9(b). In *Williams*, a plaintiff in a securities fraud case identified two persons who made false representations, pointed to assertions in a company's prospectus as the basis for the alleged fraud, and attached newspaper clippings to the complaint. The Fifth Circuit found these allegations did not meet Rule 9(b)'s standards because the complaint did not state a place or time when the individuals' statements were made and did not identify specific items in the prospectus and clippings that were fraudulent. *Williams*, 112 F.3d at 178-79. Plaintiffs in this case have done considerably less than in *Williams*. None of the documents that are said to be the basis for fraud are attached or even referred to, and no specific evidence is cited as a basis for the cause of action.

Plaintiffs argue that they have satisfied the "who" requirement merely by alleging that the Defendants engaged in a conspiracy to mislead the public by forming the Brio Site Task Force. Although the Fifth Circuit has not specifically determined whether a conspiracy to commit fraud is subject to Rule 9(b)'s heightened pleading standard, at least one District Court in this Circuit has. *Hernandez v. Ciba-Geigy Corp., U.S.A.*, 200 F.R.D. 285, 292 n.5 (S.D. Tex. 2001). The Court need not reach this issue, however, because even if Rule 9(b) does not apply to the conspiracy itself, Plaintiffs must still support their fraud claim by specifically stating when and where the Task Force made fraudulent statements. No such allegations are made. Second Amended Complaint at ¶ 65.

4

Rule 9(b)'s standards can be relaxed when information is uniquely in the hands of a defendant. *United States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999). However, Plaintiffs explicitly allege that various (though unspecified) documents, statements, and disclosures were given to the public and regulatory agencies and that they reveal the factual bases for fraud. Plaintiffs do not claim that this information is not within their reach. Presumably, such publicly disclosed evidence is either in Plaintiffs' possession or could have been obtained during the long period this case was pending before the amended complaints were filed. The Second Amended Complaint fails to identify any specific document or statement, and Plaintiffs' Response to the Rule 9(b) Motion fails to point to any evidence even after many years of discovery in this case.

Ordinarily, a Rule 9(b) dismissal is without prejudice in order to give a plaintiff the opportunity to replead. In this case, however, Plaintiffs have had ample opportunity to do so. In 2002, the Court *sua sponte* allowed Plaintiffs to restate their fraud claim in an amended complaint. This occurred six years after the case was filed and after extensive discovery had already been conducted. Plaintiffs' First Amended Complaint was struck for violating the Court's Order that repleading be limited to the fraud claim itself. The instant Second Amended Complaint was subsequently filed. Since Plaintiffs have already been allowed to replead in order to restate their fraud claims, no purpose can be served at this point in allowing a third amended complaint to be filed.

The Court therefore **RECOMMENDS** that Monsanto's Rule 9(b) Motion to Dismiss (Instrument No. 270) and the Amoco Defendants' identical motion (Instrument No. 271) be **GRANTED**.

5

<u>Motions Concerning Plaintiffs' Medical Expert, Lack of Medical Causation and Causation in Fact</u>

Monsanto also argues that Plaintiffs cannot demonstrate that their medical conditions have been caused by exposure to chemicals deposited at the Brio/DOP sites because the testimony of their medical experts is inadmissable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Amoco Defendants have filed a similar motion. In *Daubert*, the Supreme Court outlined the standards that guide a court's decision whether expert testimony satisfies the requirements of Fed.R.Evid. 702. First, the court must determine whether the testimony is reliable, a task that includes an assessment of whether the reasoning or methodology on which it relies is scientifically valid. Testimony must be grounded "in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). It must also be relevant to the issues under consideration. *Daubert*, 509 U.S. at 591; *Allen v. Pennsylvania Eng'g. Corp.*, 102 F.3d 194, 196 (5th Cir. 1996).

The burden for demonstrating the admissibility of expert testimony rests firmly on the party seeking its admission. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). In this case, of course, that means Plaintiffs. They must show by a preponderance of the evidence that the testimony offered is reliable and that there is "some objective, independent validation of the expert's methodology." *Id.* *Daubert* stressed that many factors can go into deciding whether proffered scientific evidence meets this standard, but it set out five non-exclusive issues: (1) whether a theory or technique has been tested; (2)-(3) whether it has been subjected to peer review and publication; (4) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (5) the degree to which the technique or theory

6

has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. The analysis involved in an expert's testimony must be reliable at every step of the process. *Moore*, 151 F.3d at 279, n.10. The determination of reliability is within a court's discretion as part of its "gatekeeping function" under the Federal Rules of Evidence. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 148-49 (1999).

Plaintiffs have offered opinions on the cause of their health problems by two experts: Dr. William Au and Dr. Barry Levy. The first is the simpler evaluation of the two. Dr. Au authored a two-paragraph report regarding the original Plaintiffs in December, 1998 and two additional reports in 1999 and 2000. He testified in 2002 that he had no recollection of the latter two and had discarded the material he relied on to author them. Defendants' Ex. F at 349-54. The 1998 report fails to state what Dr. Au relied on or the methodology used. He merely concludes that chemicals at the Brio/DOP sites were a major cause in Plaintiffs' health problems.

Dr. Au did not examine Plaintiffs but merely reviewed summary reports and "some medical reports" provided by Plaintiffs' counsel. Id. at Ex. G. He admitted that he did little more than glance at the records and that his review was not thorough. Id., Ex. F at 29, 38, 196-221. Dr. Au's deposition testimony shows that he was unacquainted with Plaintiffs' specific medical problems or when they arose, and he admitted that he needed to do a more thorough investigation. Id. at 196-221. He admitted in his deposition that he had no specific information on the amount of chemicals any of the Plaintiffs were exposed to. Id. at 92. His research on the specific issues relating to the Plaintiffs in this case was "very limited" when he issued his preliminary report. Id. In their Response, Plaintiffs fail to address any issues relating to Dr. Au. They therefore have failed to bear their burden of showing that his preliminary report is admissible under *Daubert*.

7

Dr. Levy's report poses more serious issues.  On December 21, 1998, Levy issued a report concerning the seven original Plaintiffs in this case.  A virtually identical report was issued on August 14, 1999, for nine other Plaintiffs in the companion case.  The first report was updated on December 15, 1999, and again on January 31, 2001.  Dr. Levy's report states that a number of volatile organic compounds, metals, and other chemicals have been found at the Brio/DOP sites and that ambient air samples adjacent to them have detected unspecified concentrations of benzene, toluene, xylene, styrene, 1,2-dichloroethane, 1,1,1-tricholoroethene, and vinyl chloride.  He further claims that each of these chemicals has been associated with various health issues that overlap with those experienced by the Plaintiffs.  According to Dr. Levy, Plaintiffs "were likely exposed to hazardous chemicals from the Brio/DOP sites by both inhalation and ingestion."  Exposure could have come from children playing in the area, through vegetables grown in the soil, and through the air.  In his deposition, Dr. Levy stressed that air exposure was the most important of these.  Id., Ex. A at 970.  In sum, Dr. Levy states that "to a reasonable degree of medical certainty . . . [Plaintiffs] have each suffered multiple adverse health effects that were caused and/or aggravated by their exposure to chemicals and substances emanating from the Brio/DOP sites."  Id., Ex. B at 39.

Levy states in the final reports that he considered the following items in reaching his conclusions:

1.  A study by the Agency for Toxic Substances and Disease Registry ("ATSDR study");

2.  A doctoral dissertation by W.G. Johanson;

3.  Maps of the Southbend division showing where Plaintiffs lived;

4.  Maps of air monitoring results done by a Trace Atmospheric Gas Analyszer ("TAGA") van;

8

5.    Exposure reports by Dr. Kirk Brown;

6.    Exposure reports by Dr. George McVehil;

7.    Medical records, questionnaires, and interviews of the Plaintiffs; and,

8.    A summary of residential and health effects information.

Unfortunately, neither side has presented a clear guide to these studies, the most important of which

for *Daubert* purposes are the ATSDR study, the TAGA data, and reports by Drs. Brown and

McVehil. The TAGA data were collected by the EPA by means of a TAGA van driving through the

Southbend subdivision on numerous occasions during the nighttime to collect information on the

amount of chemicals that were emitted from the collection pits. The ATSDR study was done by the

Department of Health and Human Services's Agency for Toxic Substances and Disease Registry.

Plaintiffs' Ex. I. According to Plaintiffs, the study found that in 1995, Southbend residents were

exposed to low levels of volatile organic compounds on four occasions between 1993 and 1994 and

that low levels of benzene, toluene, xylene, 1,1,1-tricholoroethane, trichloroethylene, napthalene, and

mesitylene were found in the air in samples from 1989 through 1993.

The Brown studies involved measurements of chemical emissions from the pits in which

various chemicals had been deposited. They were conducted by Dr. Kirk Brown, a professor of Soil

and Crop Sciences at Texas A&M University. Exposure measurements that were collected at

various points in time were used to estimate historical emissions in the past by employing a

theoretical construct known as the "Jury model." In so doing, Brown started with pit emissions

actually measured by the EPA in 1994 and then increased those exposure measurements each year

going back in time.

Plaintiffs also point to a lengthy Supplemental Report by Brown dated March 2, 2001.

9

However, they present no evidence that Levy's report relied on the Supplemental Report. Levy's last report was issued on January 31, 2001, several months before Brown's Supplemental Report was issued. Dr. Levy does state in his updated report that Brown told him on January 19, 2001, that the "amount of chemicals of concern in the Southbend neighborhood was several orders of magnitude above the TAGA van measurements." Defendants' Ex. B at 36. The report, however, does not list any documentation from Brown's updated report as a source for its conclusions, which are identical to those stated in the earlier reports. Since the primary issues at stake here are the reliability of what Levy actually relied on to reach his conclusions and the methods he himself employed, the Court does not consider the March 2, 2001, document.

The McVehil report is based on studies done by meteorologist George McVehil, Ph.D. McVehil undertook an air modeling study in 1995 to quantify the impact of toxic chemicals emitted at the relevant sites. This was based on two criteria: (1) calculated soil flux rates measured by Dr. Brown for various chemicals from 1981 through 1994 and (2) hourly meteorological measurements for 1994 collected by the Brio Air Quality Monitoring System. Id., Ex. A (unpaginated) at McVehil Report. McVehil concluded that winds would transport chemicals to the Southbend division 58% of the year; calculated the average annual and 24-hour average concentrations for four specific chemicals; found that the predicted concentrations were one to two times greater than the EPA risk-based screening levels and an order magnitude greater than levels found in the typical urban background; and stated that much higher concentrations were found at specific, and apparently random, times. Id.

Monsanto complains that Levy's report should be discounted because he frequently testifies in toxic tort cases. However, that is no reason in itself to exclude Levy's testimony. Dr. Levy has

an M.D. from Cornell University; a Masters in Public Health from Harvard University; was a tenured professor of Family and Community Medicine at the University of Massachusetts Medical School; and founded the Occupational Health Program at that institution.  At the time of his initial report, he was also an Adjunct Professor of Medicine at Tufts University and a Lecturer at the Harvard School of Public Health.  Id. at 2.  Accordingly, he is well qualified under Rule 702 to testify in this case.

The reliability of Levy's conclusions, however, is more troubling.  The Court's review of the extensive exhibits filed in support and opposition to these motions shows that serious questions have been raised concerning the methodologies used by Levy and the studies he relied on.  The most vigorous and technical of these attacks is that of physicist Brian Murphy, Ph.D.  Defendants' Ex. D. In a meticulous analysis, Dr. Murphy found that the Brown study suffers from three fundamental flaws: (1) it failed to note that the instruments used to detect the chemicals are known to confuse vinyl chloride with four different carbon hydrocarbons; (2) it confused "instrument noise" with measured chemical concentrations and failed to convert the TAGA concentrations to appropriate averaging times; and (3) it misused a theoretical model to measure chemical emissions.  The third is the most serious of these flaws because, according to Murphy, the Jury Model used in the study is intended to measure only single chemicals, not a multi-chemical mixture.  Id. at 30-31.

Monsanto argues that the use of modeling is in itself cause for rejecting Levy's report and cites *Castellow v. Chevron USA*, 97 F. Supp.2d 780, 789 (S.D. Tex. 2000).  Federal courts, however, have accepted modeling reports in mass litigation.  *See, e.g., Falise v. Am. Tobacco Co.*, 258 F. Supp.2d 63, 67 (E.D.N.Y. 2000).  Although this Court shares the same concerns about modeling expressed in *Castellow*, there are more specific grounds for rejecting it in this case.  Uncontroverted

evidence has been submitted that the Jury Model was designed only to measure single chemicals and that Brown's use of it for multi-chemicals is without scientifically-approved precedent. Defendants' Ex. D. at 31-32. Indeed, Brown admitted that he had never used the Jury Model to predict past concentrations before preparing the 1995 study and has not done so since. He has not published any peer-reviewed work on the Model as he used it and was unaware of any scientifically-accepted study that tested the Model. Id., Ex. K at 152-61. Thus, one of the foundations for Levy's conclusions is based on an untested, novel application of a technique that does not have wide scientific acceptance as it was actually used.

Even assuming the Jury Model was appropriately used, one of Plaintiffs' own experts concluded that Brown's data were in and of themselves insufficient to be the basis for a reliable model of chemical emissions that McVehil later constructed based on them. In Jim Tarr's words, "we don't have sufficiently reliable information to develop a sufficiently reliable emission inventory and subsequent air dispersion modeling to justify the effort." Id., Ex. E at 34-37. The Levy reports, in turn, are heavily dependent on McVehil's conclusions.

Dr. Murhpy also attacks McVehil's study itself. According to Murphy, McVehil's calculations for the annual average and 24-hour concentrations of chemical emissions mistakenly confuse averages with the *highest* readings for those categories. As a result, the McVehil study does not provide a representative concentration for the period of each Plaintiff's actual period of residence in Southbend. In addition, McVehil double counted vinyl chloride and 1,2-DCA and improperly compared his results, already inflated by the Brown data, with EPA screening levels. Id., Ex. D at 28-31.

The evidence clearly shows that Dr. Levy did not account for any of these failings in the

12

Brown and McVehil studies or that he had the expertise to recognize them. Levy admitted that he is not an expert in modeling or in the transport of chemicals through the soil and air. Instead, he relied on McVehil's data without recalculating them or questioning their validity. Id., Ex. A at 78, 190, 303, 541.

Nor was Levy able to account for more obvious problems in the use of his sources. The McVehil report only specified the concentration of four chemicals, not the mixture Levy states in his report. According to Levy, the most important factor in determining exposure is the concentration of chemicals over time. He claimed that he analyzed the exposure over time for the remaining chemicals not in the McVehil report by using the TAGA data. These data, however, only measured chemical concentrations at a specific moment in time, and Levy admitted that they did not reveal exposure over any given period. Id. at 246-47. His analysis was limited to simply determining the length of time each Plaintiff lived in Southbend and comparing that to other exposure data. Thus, Levy stated that he assumed the Plaintiffs' exposure was proportional to the volume of chemicals that were deposited at the Brio/DOP sites. Id. at 81, 417-19.

In so doing, Levy's exposure model employs assumptions not used by the studies of Brown and McVehil on which he draws. According to Dr. Murphy, Levy's assumption that exposure is simply proportional to the quantity of chemicals in the pits was "novel," a conclusion that can only mean that it was not a scientifically accepted method of determining exposure over time. Such a theory assumes that chemical migration and exposure do not depend on either the volatility of a specific chemical or the depth at which it was buried. Id., Ex. D at 56. According to Murphy, this theory is not scientifically valid and is contrary to a large body of accepted information concerning chemical transport. Id. Accordingly, there is no evidence that the exposure theory used by Levy is

commonly accepted among scientists; that it has been subjected to peer review or otherwise tested; or what its potential error rate might be.

Plaintiffs have not provided any defense of Levy's methodology other than an appeal to his own authority as an expert. However, such circular reasoning in which an expert gives assurances of his own accuracy is not sufficient under *Daubert*. *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995); *see also Moore*, 151 F.3d at 276. It is the duty of a federal court to determine "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). The Fifth Circuit has warned that courts must be especially cautious when, as here, expert witnesses depart from generally accepted scientific methodologies. *Allen*, 102 F.3d at 197 n.4. After carefully reviewing all the evidence in this case, the Court finds that Levy's reports violate all the non-exclusive *Daubert* factors and do not satisfy the reliability test.

Nor are the reports especially relevant. Defendants argue that they are not relevant because Levy never had any accurate information about any Plaintiffs' exact exposure. "[T]he law does not require Plaintiffs to show the precise level of [a chemical] to which they were exposed." *Curtis*, 174 F.3d at 671. But it does require facts that support an expert's finding that a plaintiff was exposed to such a degree that known harms have resulted. In *Curtis*, for example, exact exposure levels were not required when an expert relied on the fact that plaintiffs' symptoms were remarkably similar to the known effects of benzene exposure; there was a clearly-defined exposure period; and when the symptoms appeared shortly after a benzene-laden product was used. *Id*.

That is not the case here. Even according to Levy, Plaintiffs' exposure was primarily airborne and therefore occurred in a far more diffused manner than in *Curtis*, which was linked to

14

specific exposure events. The exposure here also allegedly occurred over a much longer period of time; involved multiple chemicals with different concentrations; and resulted in a large number of symptoms outlined in Levy's reports that he himself repeatedly admitted in his deposition testimony could have resulted from other known medical causes. Levy therefore did not have the close nexus of circumstantial evidence present in *Curtis* to support his conclusion that Plaintiffs suffered a harmful level of exposure to chemicals. Significantly, he admitted that in the absence of an epidemiologic study, which was not undertaken, he could not make "a valid scientific argument" that the Plaintiffs in this case had any more health problems than would ordinarily be expected in a population not exposed to harmful chemicals. Defendants' Ex. A at 991-92. The absence of an epidemiologic study is one factor in deciding that scientific evidence does not comport with Rule 702. *Allen*, 102 F.3d at 195.

After being deposed multiple times over several years, Dr. Levy was unable to quantify in any way the level of exposure Plaintiffs suffered. For example, he could not state the quantity of styrene, benzene, perchloroethyle, trichlorethylene, or 1,2-dichlorethene any Plaintiff was exposed to. Defendants' Ex. A at 943, 970. Nor did he calculate either an annual or a 24-hour dose for any Plaintiff. Id. at 251. "[S]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to *such* quantities, are minimal facts necessary to sustain a plaintiffs' burden in a toxic tort case." *Allen*, 102 F.3d at 199 (emphasis added). Indeed, Levy's deposition at times contradicts the causation findings of his own reports. For example, one report firmly concludes that Plaintiff Karl Cruz's birth defects "were caused by his mother's exposure to toxic chemicals found at the Brio site during her pregnancy," but Levy later admitted that he could not make the argument that any birth defects or neurological problems suffered by a Plaintiff in this

15

case were caused by exposure to Brio/DOP chemicals. Defendants' Ex. A at 962, 989.

Even assuming *arguendo* that Levy's exposure theory is accurate, Plaintiffs have not shown that his conclusions are based on sources that are relevant to a conclusion that Plaintiffs were actually subjected to harmful levels of chemicals. Levy cites a large number of studies in support of his conclusions concerning exposure, causation and harm. Each of these studies has been reviewed by Dr. Wayne Snodgrass, M.D., Ph.D., head of the Clinical Pharmacology-Toxicology Unit of the University of Texas Medical Branch and Medical Director of the Texas Poison Center. Dr. Snodgrass concluded that "not a single human or animal study provided by Dr. Levy demonstrates a statistically significant relationship between exposures modeled or demonstrated in Southbend and any of plaintiffs' health effects." Id., Ex. C at 36.

Plaintiffs again fail to address any of Monsanto's evidence on this issue. The absence of a substantive response supporting the relevance and reliability of Levy's opinion weighs against admission of the expert's report. *Allen*, 102 F.3d at 197. While the Court is aware of the formidable difficulties Plaintiffs face in countering the elaborate, and undoubtedly expensive, studies proffered by the Defendants, Plaintiffs still bear the burden of responding to the summary judgment evidence presented with more than assurances from Dr. Levy that he has complied with *Daubert*. "The expert's assurances that he has utilized generally accepted scientific methodology is [sic] insufficient." *Moore*, 151 F.3d at 276.

The Court therefore finds that Dr. Levy's expert reports do not satisfy *Daubert*'s requirements. As a result, Plaintiffs cannot demonstrate that the various medical harms they have allegedly suffered were actually caused by the Defendants. To show such causation, Plaintiffs must demonstrate the two elements of proximate cause under Texas law: forseeability and cause in fact.

16

*Excel Corp. v. Apodaca*, 81 S.W.3d 817, 820 (Tex. 2000). The latter requirement demands a showing that a defendant's action or product was a substantial factor in bringing about the plaintiff's injuries. *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995). This District Court has stressed that plaintiffs in a toxic tort case "must come forward with sufficient competent evidence to prove both that they were actually exposed to a toxic substance and that there is a causal link between plaintiffs' exposure and the plaintiffs' alleged injuries." *Koehn v. Ayers*, 26 F. Supp.2d 953, 955 (S.D. Tex. 1998) (Kent, J.); *see also Wooley v. Smith & Nephew Richards, Inc.*, 67 F. Supp.2d 703, 712 (S.D. Tex. 1999) (Kent, J.) ("[T]he absence of . . . expert opinion will render summary judgment appropriate.").

Even if Levy's reports satisfied *Daubert*, they do not demonstrate a causal link between the Plaintiffs' exposure to chemicals at the Brio/DOP sites and their physical ailments. As stated above, Levy's deposition testimony contradicted some statements of causation made in his reports, and he could not say that, as a whole, Plaintiffs suffered any greater number of disorders than would ordinarily be expected in a non-exposed population. In fact, he was even more candid in admitting that he could not identify *any* health effect caused by Plaintiffs' alleged exposure:

> Q:   Are you able to say, Dr. Levy, that each health effect that you have attributed to the Brio site in each Plaintiff would not have occurred if the Plaintiffs had not had the exposures you believe they had to chemicals from the Brio site?

> A:   No.

> * * * *

> Q:   Okay. Are you able to say, Dr. Levy, that any of the health effects that you have attributed to the Plaintiffs as a result of the Brio site would not have occurred if the Plaintiffs or that Plaintiff had not been exposed to chemicals from the Brio site?

* * * *

A:     No.

Defendants' Ex. A at 769-70, 771-72.  In addition, Levy repeatedly stated in his deposition that he did not eliminate alternative causes for Plaintiffs' symptoms.  Id. at 312-15, 419-26, 606-09, 618-25, 630, 632, 634, 708-09, 756-61, 764.

As stated above, Dr. Levy's opinion is not admissible and there is no evidence on the causation factor in this case.  The Court therefore **RECOMMENDS** that Monsanto's Motion Based on Lack of Medical Causation (Instrument No. 300); Monsanto's Motion for Summary Judgment Based on Lack of Evidence of Causation in Fact (Instrument No. 311); and Amoco's Motion to Strike Plaintiffs' Medical Expert (Instrument No. 322) all be **GRANTED**.

Monsanto also seeks summary judgment based on prior cases brought in state court against the Southbend developers.  In light of the Court's ruling, however, consideration of these arguments is redundant.  The Court therefore **RECOMMENDS** that Monsanto's Motion for Lack of Duty and Causation as a Result of Farm & Home Savings Association and Ayshire Corporation (Instrument No. 309) be **DENIED** as **MOOT**.

### Monsanto's Motion Concerning Fear of Future Disease

Monsanto asks for partial summary judgment on Plaintiffs' allegation that they are entitled to damages because they are afraid of developing cancer.  Second Amended Complaint at ¶ 91.  Texas law does not allow the recovery of damages based on the fear of future diseases in the absence of a present injury caused by the defendant's actions.  *Temple-Inland Forest Products v. Carter*, 993 S.W.2d 88, 92 (Tex. 1999); *Pustejovsky v. Rapid-American, Corp.*, 35 S.W.3d 643, 650 (Tex. 2000).  As outlined above, Plaintiffs have not shown that the Defendants in this case have caused them any

18

specific injury, and therefore they cannot assert a claim based on the fear of future disease.

The Court **RECOMMENDS** that Monsanto's Motion Concerning Fear of Future Disease (Instrument No. 308) be **GRANTED**.

### Monsanto's Motion Regarding Medical Monitoring

Monsanto also seeks partial summary judgment on the claim that Plaintiffs are entitled to damages in order to monitor their future medical conditions. Texas, however, does not recognize a medical monitoring claim. Jurisdictions that do allow such claims require a plaintiff to demonstrate that he has an actual physical injury that requires future monitoring. *See, e.g., In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 852 (3rd Cir. 1990) (construing Pennsylvania law). This is consistent with the general requirement in Texas that claims seeking damages for future medical care require a showing of a present injury. *K-Mart Corp. v. Pearson*, 818 S.W.2d 410, 415 (Tex. App. - Houston [1st Dist.] 1991). Plaintiffs implicitly acknowledge this by relying on Dr. Levy's conclusions that they have suffered physical harm as a result of their exposure to chemicals deposited at the Brio/DOP sites. As shown above, however, Plaintiffs are unable to demonstrate that any such harm was caused by the Defendants.

The Court therefore **RECOMMENDS** that Monsanto's Motion Regarding Plaintiffs' Medical Monitoring Claims (Instrument No. 312) be **GRANTED**.

### Monsanto's Negligence Per Se Motion

Monsanto next seeks partial summary judgment on Plaintiffs' negligence per se claims. Plaintiffs allege that Defendants violated the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 41 U.S.C. § 9601 et seq.; the Clean Water Act, 33 U.S.C. § 1251 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300ff.; the Texas Clean Air Act of

1965; the Texas Water Pollution Control Act of 1961; the Texas Water Quality Act of 1967; the Texas Solid Waste Act, the Solid Waste Disposal Act; and Orders and Regulations of the Texas Water Quality Board and Texas Air Control Board.

To establish negligence per se, a plaintiff must prove: (1) the defendant's act or omission is in violation of a statute or ordinance; (2) the injured person was within the class of persons that the ordinance was designed to protect; and (3) the defendant's act or omission proximately caused the injury. *Ambrosio v. Carter's Shooting Center, Inc.*, 20 S.W.3d 262, 265 (Tex. App. - Houston [14th Dist.] 2000).   Whether a claim is based on negligence or negligence per se, a plaintiff must demonstrate that the defendant's negligence was the proximate cause of his injury. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex. 1987).

Monsanto argues that Plaintiffs cannot show as a matter of law that the statutes allegedly violated give rise to negligence per se claims because the statutes do not define a standard of conduct.   However, the Court need not reach that issue because, as shown above, Plaintiffs have not demonstrated that the Defendants' actions formed the proximate cause of their medical harms.   In the absence of an injury, Plaintiffs cannot state a claim for negligence per se.

The Court therefore **RECOMMENDS** that Monsanto's Motion on the Negligence Per Se Claims (Instrument No. 307) be **GRANTED**.

### Monsanto's Fraud and Misrepresentation Motion

Monsanto seeks partial summary judgment on Plaintiffs' claims of fraud and misrepresentation.   The fraud claims have already been dismissed, as discussed above.   The misrepresentation claim is not entirely clear.   Plaintiffs' Second Amended Complaint claims Defendants are strictly liable for misrepresentation under the Restatement (Second) of Torts. Second

20

Amended Complaint at ¶¶ 54-58. Presumably, Plaintiffs are relying on § 402(b) of the Restatement, which gives rise to strict liability whether the misrepresentations were made innocently, negligently, or intentionally. *Nugent v. Utica Cutlery Co.*, 636 S.W.2d 805, 814 (Tex. App. - San Antonio 1982). However, Plaintiffs' strict liability allegations have already been struck by this Court, which interprets the misrepresentation claim in the Second Amended Complaint to be raised under Texas common law. However, insofar as a § 402(b) claim is still at issue here, it fails for the reasons stated below.

To demonstrate misrepresentation, a plaintiff must show: (1) the defendant made a material representation; (2) the information represented was false; (3) it was false at the time the representation occurred; (4) the defendant made the representation recklessly; (5) the defendant intended plaintiff to rely on the representation; (6) plaintiff, in fact, relied on it; and (7) the plaintiff was harmed as a result of his reliance. *Shannon v. Law-Yone, M.D.*, 950 S.W.2d 429, 433 (Tex. App. - Ft. Worth 1997). If a representation is made negligently, a claim for negligent misrepresentation still requires a showing that the plaintiff was harmed as a result of relying on the information at issue. *Larsen v. Carlene Langford & Assoc, Inc.*, 41 S.W.3d 245, 249 (Tex. App. - Waco 2001).

Monsanto argues that the reliance factor in this test fails because all the Plaintiffs were minors at the time the alleged representations occurred and could not have relied on them as a matter of law. Texas caselaw does not impute the parents' reliance to their children. Plaintiffs respond that actual reliance is not always required. Again, however, the Court need not reach this issue because Plaintiffs have not shown that they were harmed as a result of any alleged misrepresentation. Consequently, they cannot sustain a cause of action for misrepresentation whether it is based on

21

fraud, negligence, or strict liability.

The Court therefore **RECOMMENDS** that Monsanto's Motion on Fraud and Negligent Misrepresentation (Instrument No. 305) be **GRANTED**.

<u>The Amoco Defendants' Motion for Summary Judgment</u>

Fortunately for the Court, the Amoco Defendants have filed a consolidated Motion for Summary Judgment that includes all of Plaintiffs' causes of action.  As Amoco rightly states, medical causation is required for each of Plaintiffs' causes of action in this case.  For all the reasons stated above, Plaintiffs cannot demonstrate such causation and therefore cannot sustain any of their allegations in this case.

The Court therefore **RECOMMENDS** that the Amoco Defendants' Motion for Summary Judgment (Instrument No. 321) be **GRANTED**.

**Conclusion**

The Court **RECOMMENDS** that the following Motions by Monsanto be **GRANTED**: (1) Motion to Dismiss Fraud Claims (Instrument No. 270); Summary Judgment Based on Medical Causation (Instrument No. 300); Partial Summary Judgment on Fraud and Negligent Misrepresentation (Instrument No. 305); Partial Summary Judgment on Negligence Per Se (Instrument No. 307); Motion Concerning Fear of Future Disease (Instrument No. 308); Summary Judgment for Lack of Evidence on Causation in Fact (Instrument No. 311); and Summary Judgment Reagarding Medical Monitoring Claims (Instrument No. 312).

The Court **RECOMMENDS** that Monsanto's Motion for Summary Judgment for Lack of Duty and Causation (Instrument No. 309) be **DENIED** as **MOOT**.

The Court also **RECOMMENDS** that the following Motions filed by the Amoco Defendants

22

be **GRANTED**: (1) Motion to Dismiss Fraud Claims (Instrument No. 271); Motion for Summary Judgment (Instrument No. 321); and Motion to Strike Plaintiffs' Expert (Instrument No. 322).

Finally, the Court **RECOMMENDS** that the instant case be **DISMISSED**.

The Clerk shall send copies of this Report and Recommendation to the parties by the means in place for transmission of same. Plaintiff shall have until **April 4, 2005**, to have written objections, filed pursuant to 28 U.S.C. § 636(b)(1)(C), **physically on file** in the Office of the Clerk. The Objections shall be mailed to the Clerk's Office in Galveston, Texas 77553 at P.O. Drawer 2300. **Any Objections filed shall be contained in a written document specifically entitled "Objections to the Report and Recommendation of the Magistrate Judge"**, which will then be forwarded to the District Judge for consideration. Failure to file written objections within the prescribed time shall bar the aggrieved party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this _____ 14th _____ day of March, 2005.

JOHN R. FROESCHNER
UNITED STATES MAGISTRATE JUDGE